**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MIGUEL TORRALBA-MENDIA,
*Defendant-Appellant*.

No. 13-10064

D.C. No.
4:10-cr-00754-
CKJ-JR-13

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
February 2, 2015—San Francisco, California

Filed April 28, 2015

Before: Richard C. Tallman and Johnnie B. Rawlinson,
Circuit Judges, and Stephen Joseph Murphy III, District
Judge.[*]

Opinion by Judge Murphy

---

[*] The Honorable Stephen Joseph Murphy III, District Judge for the U.S. District Court for the Eastern District of Michigan, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for conspiring to smuggle undocumented immigrants into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I).

The panel held that, in light of *United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014), the district court committed plain error by not instructing the jury on how to properly evaluate the testimony of ICE Agent Frazier, whom the government used as both an expert and lay witness. The panel found that the error was not prejudicial because the government bifurcated Frazier's expert and lay opinion testimony, there was an adequate foundation for his observations, and sufficient evidence independent of his testimony linked the defendant to the conspiracy.

The panel held that the district court did not abuse its discretion in admitting ICE Agent Burrola's expert testimony about alien smuggling organizations. The panel held that the testimony helped the jury understand the defendant's role in the alien smuggling scheme, and that the testimony was not unduly prejudicial.

The panel held that a rational juror could find beyond a reasonable doubt that the defendant joined the conspiracy with the intent to further it.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the defendant's arguments that I-213 immigration forms, which the government introduced to show that many of the passengers detained during the investigation were in fact deported, contained inadmissible hearsay and that their introduction violated the Confrontation Clause. The panel held that the redacted forms were admissible under Fed. R. Evid. 803(8) as ministerial records, kept in the regular course of Department of Homeland Security business, and not implicating the purposes animating the law enforcement exception to admissibility. The panel held that admission of the forms did not violate the defendant's confrontation rights because nothing in them suggests they were completed in anticipation of litigation, and they are not testimonial.

## COUNSEL

Saji Vettiyil, Vettiyil & Associates, Nogales, Arizona, for Defendant-Appellant.

John S. Leonardo, United States Attorney, Robert L. Miskell, Appellate Chief, Bruce M. Ferg (argued), Assistant United States Attorney, United States Attorney's Office, Tucson, Arizona, for Plaintiff-Appellee.

## OPINION

MURPHY, District Judge:

A jury convicted Miguel Torralba-Mendia of conspiring to smuggle undocumented immigrants into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). Torralba appeals his conviction, contending there was insufficient evidence connecting him to the conspiracy. In addition, he argues the district court incorrectly allowed an expert witness to testify about common practices of alien smuggling organizations. He contends the district court erred in allowing the case agent to offer both lay and expert testimony without giving a curative instruction. And he argues the district court incorrectly admitted redacted I-213 immigration forms. We have jurisdiction under 28 U.S.C. § 1291, find no prejudicial error, and affirm.

I

A

Between 2007 and 2010, Immigration and Customs Enforcement ("ICE") agents investigated a human smuggling operation near Nogales, Arizona. The investigation revealed that members of the smuggling organization would meet migrants on the Mexican side of the border. Escorts would guide the migrants through the ravines and creek-beds that lie adjacent to Nogales. Once inside the United States, a van or sedan would meet the migrants in the desert and drive them to Geuro Shuttle ("GS"), a company operating out of Tucson. From there, shuttles would drive the migrants to safe houses where they were confined until family members paid for their release.

During the investigation, agents observed Torralba at GS between twenty and twenty-five times. Through intercepted phone calls, agents overheard Torralba coordinate the pick up of migrants and organize their drive north. Agents listened as a person at GS told Torralba to charge $2100 to drive two people to Tucson. And agents observed Torralba pick up and deliver suspected illegal immigrants to locations in Phoenix.

On one occasion, Torralba picked up several people from GS. Before starting the drive to Phoenix, Torralba did a "heat run" through a local neighborhood: He rapidly accelerated and decelerated, to check if police were following him. He then parked outside a carwash for ten minutes, watching the road. On another occasion, he drove past an unmarked police car with tinted windows parked across from GS. Torralba stopped his car next to the vehicle and tried to look in. He then called GS and told them about the car. Torralba also called GS to tell them that "[t]hey just opened up over here, straight ahead." GS then notified other shuttle drivers that ICE was not operating its checkpoint along the route from Nogales to Tucson.

B

At trial, the government called Agent Burrola as an expert witness. Burrola has more than a decade of law enforcement experience along the border, including three years undercover smuggling undocumented immigrants from Nogales to stash houses in Tucson and Phoenix. He testified about the standard practices of alien smuggling organizations, including how they escorted people over the border, circumvented ICE checkpoints, and utilized safe houses. He explained how to identify undocumented immigrants en route from Mexico,

interpreted common code words, and described typical methods and amounts of payment.

The government also called Agent Frazier as both an expert and lay witness. Frazier spent nine years patrolling the border near Nogales. Like Burrola, he explained how smugglers evaded checkpoints and provided ways to distinguish between a guide and a migrant.

After giving expert testimony about the standard practices of alien smuggling organizations, Frazier began to offer lay testimony. The government transitioned from expert to lay testimony by asking, "[a]nd were you eventually assigned to an investigation involving Southern Arizona shuttle companies?" Frazier then  testified intermittently over the next few days about his observations in this case. He narrated surveillance videos showing vehicles dropping off and picking up people from GS. He told the jury the duration of time lapses in the videos, pointed out the vehicles' identifying marks, tied the cars to various conspirators, and counted the number of people exiting and entering different vehicles. He also interpreted phrases in phone calls between shuttle drivers and GS. And he explained which conspirators he thought were the organization's leaders based on evidence that they controlled the migrants, recruited workers, and gave orders to the drivers.

During the trial, the government introduced I-213 immigration forms to prove the migrants detained during the investigation either voluntarily returned to their country of origin or were deported. The admitted forms contained the migrants' photos, fingerprints, physical characteristics, and whether they had been deported or voluntarily returned to their country of origin. The government redacted the agent's

narrative detailing how people were apprehended, and all other statements made by the detainee.

## II

Torralba challenges the government's use of Agent Frazier as both an expert and lay witness. He contends the district court erred by not instructing the jury on how to evaluate Frazier's dual role testimony, and that much of Frazier's testimony invaded the province of the jury. We hold that, in light of our opinion in *United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014), the district court committed plain error by not instructing the jury on how to properly evaluate Frazier's testimony. Nonetheless, we find that the error was not prejudicial because the government bifurcated Frazier's expert and lay opinion testimony, there was an adequate foundation for Frazier's observations, and sufficient evidence independent of Frazier's testimony linked Torralba to the conspiracy.

## A

Torralba argues the district court erred by not instructing the jury on how to properly evaluate Agent Frazier's expert and lay testimony. Because Torralba did not object to the absence of such a jury instruction, we review for plain error. *See United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000); *see also Puckett v. United States*, 556 U.S. 129, 135 (2009) (citing Fed. R. Crim. P. 51(b) & 52(b)).

We have cautioned district courts about the dangers of allowing a case agent to offer both expert and lay opinion testimony. *See Vera*, 770 F.3d at 1242; *United States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009); *United States v.*

*Freeman*, 498 F.3d 893, 903–04 (9th Cir. 2007). "[A]n agent's status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and rely on hearsay." *Vera*, 770 F.3d at 1242.

There are several ways to mitigate these concerns. First, the district court should clearly separate the case agent's testimony between lay observations and expert testimony. *See Anchrum*, 590 F.3d at 803. Second, the district court should require an adequately specific foundation, so that the jury has the information needed to evaluate the case agent's testimony. *See Vera*, 770 F.3d at 1243. Third, "the jury must be instructed about what the attendant circumstances are in allowing a government case agent to testify as an expert." *Id.* at 1242 (internal quotation marks omitted). Finally, the court should not allow an officer to "testify based on speculation, rely on hearsay, or interpret unambiguous, clear statements." *Id.*

In *Vera*, we held that "[i]n light of our Circuit's clearly expressed concerns about case agents testifying in both lay and expert capacities, the district court's failure to give an instruction explaining [the agent's] dual roles was plain error." *Id.* at 1246. We emphasized that, although the defense had not objected to the jury instructions, "the ultimate responsibility for assuring the reliability of expert testimony and for instructing the jury on how to evaluate case agent dual role testimony rests with the district court." *Id.* at 1243.

In the present case, the district court offered to instruct the jury on how to properly evaluate expert and lay testimony. The government also stated it had an instruction that would

help the jury evaluate Frazier's dual role testimony. Torralba objected to the government's proposed instruction, however, and failed to offer an instruction of his own. The district court instructed the jury on how to evaluate opinion testimony generally, but did not include any instruction on differentiating between lay and expert testimony. Torralba did not object to the instructions read to the jury.

We hold the district court committed plain error by not instructing the jury on how to evaluate dual role testimony. While there is a small degree of invited error—the district court solicited Torralba to offer an instruction about dual role testimony—our cases make clear that the trial court is ultimately responsible for ensuring the jury understands how to evaluate dual role testimony. *Vera*, 770 F.3d at 1243. Accordingly, the district court committed plain error by not giving a curative instruction, though the error was not prejudicial for the reasons stated in section C.

B

Torralba also argues the district court erred in allowing Frazier to narrate videos, interpret phrases in recorded phone calls, and opine about the role of various conspirators. With a few exceptions, Torralba did not object to Frazier's testimony. We review objected to evidentiary rulings for abuse of discretion, and unobjected to evidentiary issues for plain error. *United States v. Banks*, 514 F.3d 959, 975–76 (9th Cir. 2008). For the following reasons, we find Frazier offered proper lay testimony and did not invade the province of the jury.

First, we have previously held that an officer who has extensively reviewed a video may offer a narration, pointing

out particulars that a casual observer might not see. In *United States v. Begay*, 42 F.3d 486, 502–03 (9th Cir. 1994), an officer narrated a video of a riot. We held the narrative was proper lay testimony. The officer had personal knowledge of the events in the video because he had watched the video nearly a hundred times. And his narration was helpful because he pointed out details a casual observer was likely to miss. Thus, the officer's "testimony concerning which persons were engaged in what conduct at any given moment could help the jury discern correctly and efficiently the events depicted in the video." *Id.* at 503.

Torralba did not object when Frazier narrated videos showing cars arriving and departing from GS. Frazier testified that he had watched each video roughly fifty times, and that he would often watch the video feed live while it was being recorded. The narratives helped the jury understand what they were seeing. For example, Frazier provided the length of time lapses between video clips. He pointed out unique characteristics of the vehicles—like their makes, models, and whether any bodywork had been done to them—that helped the jury identify the same cars in subsequent videos. He linked the different cars to specific conspirators. He counted the number of passengers exiting or entering the vehicles (a difficult task because the video's angle obscured the view). And he pointed out the particular clothing of certain passengers, to show that a person dropped off in one video was the same person picked up in a later video. Frazier's narratives were based on his repeated viewing of the recordings, and helped the jury understand the import of the videos.

Second, we have held that an officer may give lay testimony about the meaning of ambiguous phrases in

recorded calls. The interpretations must be based on the officer's observations in the case, should not rely on hearsay, and must be helpful; i.e., the officer should not interpret clear language. *Freeman*, 498 F.3d at 902, 904–05. For example, in *Freeman*, we found an officer properly interpreted "'[m]an, it's done already' to mean 'he's given the cocaine to Kevin Freeman and that he's received money for it.'" *Id.* at 902. That testimony was based on the witness' personal knowledge of the investigation and was helpful to the jury. To the contrary, in *Vera* we explained that a case agent improperly interpreted the demand that a supplier "'lower the price for you, fool, because tell her that it is a little expensive, fool,' as meaning that 'whatever she is selling it for, Mr. Vera probably feels it's a little more expensive than what he wants to pay for it, so he's trying to negotiate, maybe get the price lowered.'" *Vera*, 770 F.3d at 1246 n.9. The testimony merely restated the obvious, and was not helpful.

Here, Frazier interpreted multiple recorded phrases. Torralba objected to only two of the interpretations. He objected when Frazier stated the word "radio" referred to a Nextel push-talk phone, arguing the meaning of "radio" was obvious and not helpful to the jury. The government argued that Frazier's interpretation was based on his listening to thousands of recorded phone calls, and the explanation helped the jury put the calls in context. Even if the interpretation was not proper lay testimony—it is unclear why the distinction between a traditional radio and a Nextel push-talk phone is relevant—its admission was harmless for the reasons stated below.

Torralba also objected when the government asked Frazier to interpret Torralba's statement that "it's open straight ahead." At a bench conference, the government stated

it expected Frazier to testify that the phrase meant ICE was not operating its checkpoint. After the testimony resumed, Frazier stated it was common for smugglers to tell each other when ICE was not operating the checkpoint. But he did not interpret the phrase "it's open straight ahead," and therefore no error occurred.

Torralba did not object when Frazier interpreted phrases in other recorded phone calls. For example, Frazier stated the words "in the fight" meant the smugglers were trying to guide the migrants around an ICE checkpoint. In support, he explained that he heard that phrase in many phone conversations when the smugglers were transporting people from Nogales to Tucson. According to Frazier, the region south of Tucson contained "a particularly heavy concentration of United States Border Patrol Agents." The district court did not commit plain error in admitting this, and similar, unobjected to testimony: Frazier interpreted arguably ambiguous phrases based on his extensive review of the recorded phone calls, and he consistently explained his reasoning.

Finally, Torralba argues Frazier invaded the province of the jury when he opined that Chapo Casino, Geuro Pesado, and Alfredo Olea—three men frequently overheard talking on the phone and meeting at GS—led the alien smuggling organization. Torralba objected to this portion of Frazier's testimony at trial. A lay witness may opine about a person's role in an organization when the opinion is based on his own perceptions, is helpful to the jury, and does not require specialized knowledge. *See* Fed. R. Evid. 701; *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1245–46 (9th Cir. 1997) (explaining that lay witnesses may testify about the implication of an observation when the "observations are

common enough and require such a limited amount of expertise, if any, that they can, indeed, be deemed lay witness opinion").

Frazier testified that Chapo Casino, Geuro Pesado, and Alfredo Olea headed the alien smuggling organization. In support, he pointed to phone conversations in which the men tried to recruit shuttle operators. Furthermore, they referred to the migrants as "mine" or "theirs," and showed control over the undocumented immigrants. They coordinated the shuttles and gave orders to the drivers.

Frazier's testimony was based entirely on his observations in the case. He listened to hours of recorded phone calls, during which he discerned the relationship between the speakers. The phone calls that he based his inferences upon were received as evidence. By knowing the relationship between the speakers, the jury could better understand the meaning and context of the calls. And Frazier's opinion about the members' organizational roles was not based on specialized knowledge or expertise in alien smuggling: Managers in a wide variety of organizations recruit employees, coordinate operations, and give orders to workers.

In short, Frazier offered appropriate lay testimony when he narrated the videos, interpreted ambiguous phrases in recorded phone calls, and stated he thought certain people led the alien smuggling organization.

## C

The district court committed plain error when it failed to instruct the jury on how to evaluate Frazier's dual role testimony. We remedy a district court's plain error only when

the defendant shows that the error affected his substantial rights. Fed. R. Crim. P. 52(b); *Puckett*, 556 U.S. at 135. Put differently, there "must be a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010).

In *Vera*, we held the court's failure to instruct the jury on how to evaluate an agent's dual role testimony prejudiced the defendants. We noted the agent's opinion "comprised the sole evidence" about the quantity of drugs at issue. 770 F.3d at 1246. The district court did not "require an adequately specific foundation" for the agent's opinions. *Id.* at 1243. And the agent testified about the meaning of phone calls "well within the understanding of an ordinary juror," which "may have encouraged the jury to defer to [the agent's] opinions instead of listening to the calls and reaching an independent judgment." *Id.* at 1246.

Here, Torralba has not shown the absence of a curative instruction affected the outcome of the trial. First, the government bifurcated Frazier's testimony between his expert testimony and percipient observations. Frazier's testimony began with his credentials in the field of alien smuggling, his descriptions of how smugglers circumvented ICE checkpoints, and the common characteristics of undocumented immigrants en route from Mexico. After the completion of his expert testimony, the government transitioned to questions about the instant case, asking "[a]nd were you eventually assigned to an investigation involving Southern Arizona shuttle companies?" From that point forward, Frazier testified about his observations during the investigation of GS. When the government divided Frazier's "testimony into two separate phases it avoided blurring the distinction between Agent [Frazier's] distinct role as a lay

witness and his role as an expert witness." *United States v. Anchrum*, 590 F.3d 795, 804 (9th Cir. 2009).

Second, Frazier provided an adequate foundation for most of his observations. Whether he was narrating videos, interpreting phone calls, or opining on the role of various conspirators, he consistently explained his reasoning. And the evidence that he based his testimony on—videos, phone call recordings, still frame photos—was all given to the jury. Thus, the jury had the information it needed to evaluate Frazier's opinions.

Third, a substantial amount of evidence, aside from Frazier's testimony, connected Torralba to the conspiracy. Videos captured him repeatedly picking up suspected illegal immigrants from GS. Recorded phone conversations detailed his efforts to retrieve groups from the desert, as well as the amount of money he intended to charge. And his actions—engaging in counter-surveillance, alerting GS to a suspected police vehicle, and telling GS that ICE was not operating its checkpoint—all support the verdict. Accordingly, while the court committed plain error in not giving a curative instruction, the error was not prejudicial and does not require reversal.

III

Torralba next claims the district court erred in allowing Agent Burrola to offer expert testimony about alien smuggling organizations, arguing the testimony's probative value was greatly outweighed by unfair prejudice. *See* Fed. R. Evid. 403. We review a district court's decision to admit expert testimony for abuse of discretion. *See United States v. Mejia-Luna*, 562 F.3d 1215, 1218 (9th Cir. 2009).

We have previously held that government agents may testify about the general practices of alien smuggling organizations to establish their modus operandi. In *Mejia-Luna*, we found the district court did not abuse its discretion by admitting expert testimony about "how alien smuggling operations typically operate, the division of responsibility among numerous actors, the methods used, and the manner and method of payment." *Id.* at 1219. Similarly, in *United States v. Lopez-Martinez*, we held the district court did not commit plain error by allowing a government agent to testify "about patterns and methods common among smugglers" in the local area. 543 F.3d 509, 514–15 (9th Cir. 2008). We have also found that expert witnesses may testify about the meaning of code words or specialized jargon. *See United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014).

In the present case, Burrola testified about how alien smuggling organizations guide people across the border, evade ICE checkpoints and patrols, and employ safe houses. He pointed out common characteristics of undocumented immigrants en route from Mexico: They were often dirty due to spending several days and nights walking through the wilderness, carried little luggage, and were controlled by guides. He also interpreted common code words or jargon, and described the amounts and methods of payment.

Burrola's testimony helped the jury understand Torralba's role in the alien smuggling scheme. Based on the common characteristics of migrants en route from Mexico, a jury could determine Torralba knew many of his passengers were not legitimate travelers. Burrola's testimony about the typical smuggling rate is consistent with the amount Torralba stated he would collect to drive two people to Tucson. And Burrola's statements about how guides escort people across

the border and around ICE checkpoints helped the jury understand why Torralba coordinated the pick up of groups from remote areas of the desert.

Furthermore, Torralba has not shown the testimony was unduly prejudicial. The only Ninth Circuit precedent he cites were non-conspiracy cases in which we found evidence about the structure of a criminal organization was highly prejudicial and not relevant. *See United States v. Varela-Rivera*, 279 F.3d 1174, 1179 (9th Cir. 2002) ("[E]xpert testimony on the modus operandi of drug trafficking organizations is inadmissible in cases where, as here, the defendant is not charged with conspiracy to distribute drugs."); *United States v. Pineda-Torres*, 287 F.3d 860, 864 (9th Cir. 2002) (same); *United States v. Vallejo*, 237 F.3d 1008, 1015–17 (9th Cir. 2001) (same). Here, by contrast, the government charged Torralba with a conspiracy. Evidence about the smuggling organization's methods helped prove the existence of a conspiracy and put Torralba's actions in context. Accordingly, the district court did not abuse its discretion in admitting Burrola's expert testimony.

IV

Torralba concedes the government proved an alien smuggling organization was operating out of GS, but argues there was no evidence he was aware of, or joined, any conspiracy. "We review de novo the district court's denial of a motion for judgment of acquittal based on insufficient evidence." *United States v. Mincoff*, 574 F.3d 1186, 1191–92 (9th Cir. 2009) (citations omitted). When reviewing the sufficiency of the evidence, we "view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the defendant

guilty of each element of the crime beyond a reasonable doubt." *United States v. Heller*, 551 F.3d 1108, 1113 (9th Cir. 2009).

Section 1324 provides criminal penalties for "[a]ny person who . . . engages in any conspiracy to commit any of the preceding acts." 8 U.S.C. § 1324(a)(1)(A)(v). To establish an alien smuggling conspiracy, the government must prove an agreement to carry out one of the substantive offenses, and that Torralba had the intent necessary to commit the underlying offense. *See United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001) (interpreting a similarly worded drug conspiracy statute); *see also United States v. Shabani*, 513 U.S. 10, 13 (1994) (holding conspiracies require an overt act only when explicitly stated in the statute's text).

It is undisputed that a conspiracy to smuggle undocumented immigrants into the United States existed. The only question is whether Torralba was part of the conspiracy and whether he intended to further it. Once the government has established the existence of a conspiracy, "evidence of only a slight connection is necessary to support a conviction of knowing participation in that conspiracy." *United States v. Sanchez-Mata*, 925 F.2d 1166, 1167 (9th Cir. 1991). A "slight connection means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details." *Herrera-Gonzalez*, 263 F.3d at 1095. But it does require more than a "[m]ere casual association with conspiring people." *United States v. Estrada-Macias*, 218 F.3d 1064, 1066 (9th Cir. 2000) (quoting *United States v. Cloughessy*, 572 F.2d 190, 191 (9th Cir. 1977)).

Ample evidence showed that Torralba joined the conspiracy with the intent to further its objectives. For example, in a recorded phone call, Torralba agreed to deliver two people for $2100, an amount consistent with the rates traffickers charge to smuggle people to Tucson. In other calls, Torralba coordinated the pick up and delivery of migrants, and videos showed him transporting suspected illegal immigrants from GS on multiple occasions. Furthermore, many of Torralba's actions are inconsistent with being simply an unsuspecting shuttle driver. He engaged in counter-surveillance techniques to evade police, informed GS of an unmarked police car watching the business, and called GS to tell them the ICE checkpoint was not operating. Based on these facts, a rational juror could find beyond a reasonable doubt that Torralba joined the conspiracy with the intent to further it.

V

The government introduced I-213 immigration forms, which were labeled a "Record of Deportable/Inadmissible Alien." The government introduced the forms to show that many of the passengers detained during the investigation were, in fact, deported. Torralba argues that the forms contained inadmissible hearsay and their introduction violated the Confrontation Clause. We review the district court's rulings on the Confrontation Clause and its construction of the hearsay rules de novo. *United States v. Morales*, 720 F.3d 1194, 1199 (9th Cir. 2013). We review decisions to admit evidence under a hearsay exception for abuse of discretion. *Id.*

A

Torralba first argues the forms are inadmissible hearsay. Under Rule 803(8), a record or statement of a public office is admissible as an exception to the hearsay rule if it sets out "a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel." Fed. R. Evid. 803(8)(A)(ii).

In *United States v. Lopez* we held the public records exception applied to a "Verification of Removal." 762 F.3d 852, 861 (9th Cir. 2014). The verification of removal contained the date, port, and manner of the alien's departure, as well as the alien's photograph, signature and fingerprint, and an officer's signature. *Id.* at 856. We reasoned the officer had a legal duty to fill out the form, explaining that "[r]ecording and maintaining verifications that an individual has been deported falls under the rubric of responsibilities assigned to the Department of Homeland Security; therefore, completing the verification of removal form is appropriate to the function of the agency." *Id.* at 862. Furthermore, we found the documents admissible notwithstanding the general prohibition against admitting records created by law enforcement. We reasoned the law enforcement prohibition's purpose was to "exclude observations made by officials at the scene of the crime or apprehension, because observations made in an adversarial setting are less reliable than observations made by public officials in other situations." *Id.* at 861 (quoting *United States v. Hernandez-Rojas*, 617 F.2d 533, 535 (9th Cir. 1980)). The verification of removal, by contrast, was a "ministerial, objective observation" that merely "records the movement of aliens across the United States border," and was therefore "inherent[ly] reliab[le] because of the Government's need to keep accurate records

of the movement of aliens." *Id.* (internal quotation marks and citations omitted); *see also United States v. Loyola-Dominguez*, 125 F.3d 1315, 1317–18 (9th Cir. 1997) (finding warrants of removal/deportation were admissible under public records hearsay exception).

The same principles apply here. The admitted record of a deportable alien contains the same information as a verification of removal: The alien's name, photograph, fingerprints, as well as the date, port and method of departure, and the officer's signature. The government redacted all other statements, including the officer's narration explaining how the alien was apprehended, and the alien's statements regarding his country of origin and address. Furthermore, the record of a deportable alien, like a verification of removal, is part of an alien's A-File, filled out and kept by the Department of Homeland Security in its regular course of business. Finally, the admitted forms are a ministerial, objective observation detailing how the aliens were repatriated, and do not implicate the purposes animating the law enforcement exception. Other circuits addressing this issue have found I-213 forms admissible under Rule 803(8). *See United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010); *Renteria-Gonzalez v. I.N.S.*, 322 F.3d 804, 817 n.16 (5th Cir. 2003).

Torralba's arguments to the contrary are unavailing. He contends the Court must evaluate whether the aliens' statements independently qualify for a hearsay exception. For example, in *Morales*, we held an I-826 form containing migrants' statements about their country of origin and admissions that they were in the United States illegally did not fall within the public records exception. 720 F.3d at 1201–02. We explained that the aliens did not have a duty to

report their immigration status or their place of birth. Here, by contrast, the government has thoroughly redacted the forms. The I-213 forms do not contain any alien statements about their country of origin, or any admission that they were in the United States illegally. Accordingly, there is no need to determine if the aliens' statements qualify for a hearsay exception, as no such statements were included in the forms.

B

Torralba also contends the admission of the I-213 forms violated his confrontation rights. The Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he Confrontation Clause bars admission of testimonial statements unless the declarant is unavailable to testify and the defendant previously had an opportunity to cross-examine the declarant." *United States v. Albino-Loe*, 747 F.3d 1206, 1210 (9th Cir. 2014). A statement is within the "core class of testimonial statements" when it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quoting *Crawford v. Washington*, 541 U.S. 36, 52 (2004)).

The Supreme Court has explained that public records are normally non-testimonial because they are "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Id.* at 324. We have repeatedly held that immigration documents contained in an alien's A-file are non-testimonial because they are "not made in anticipation of litigation, and because [they are] simply a routine, objective cataloging of an unambiguous

factual matter." *Lopez*, 762 F.3d at 860 (holding verification of removal was non-testimonial); *see also Albino-Loe*, 747 F.3d at 1210–11 (holding notice to appear was non-testimonial); *Morales*, 720 F.3d at 1200 (holding I-826 forms were non-testimonial); *United States v. Orozco-Acosta*, 607 F.3d 1156, 1164 (9th Cir. 2010) (holding warrants of removal were non-testimonial); *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1075 (9th Cir. 2005) (same).

The same principles apply here. Nothing in the I-213 forms suggest the documents were completed in anticipation of litigation. Rather, the I-213 form "is routinely completed by Customs and Border Patrol agents in the course of their non-adversarial duties, not in the course of preparing for a criminal prosecution." *Caraballo*, 595 F.3d at 1226. As is evident from the form itself, the record of a deportable alien merely collects the alien's biographical information, gives the officer an opportunity to describe how the person was apprehended (which the government redacted), and states whether they were deported or voluntarily returned. Agents complete I-213 forms regardless of whether the government decides to prosecute anyone criminally. *See id.* at 1228 ("[T]he I-213 form is routinely requested from every alien entering the United States, and the form itself is filled out for anyone entering the United States without proper immigration papers."). As with other evidence in an alien's A-file, the documents are prepared for administrative purposes, not as evidence in a later trial. Accordingly, because the documents are not testimonial, their admission did not run afoul of the Confrontation Clause.

VI

There was no reversible error and we therefore affirm.

**AFFIRMED**.