NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 8 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 16-50347 |
| Plaintiff-Appellee, | D.C. No. 2:13-cr-00719-PSG-4 |
| v. | |
| KAREN OGANES SARKISSIAN, AKA Gary Sarkissian, AKA Karen Oganesovich Sarkissian, AKA Seal 2, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted August 9, 2018
Pasadena, California

Before: TASHIMA and CHRISTEN, Circuit Judges, and RUFE,** District Judge.

Karen ("Gary") Sarkissian appeals from the judgment of conviction

sentencing him to 57 months of imprisonment after a jury found him guilty of

conspiracy to commit money laundering, money laundering, and health-care fraud,

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

** The Honorable Cynthia M. Rufe, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

as charged in a multi-defendant indictment.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291. Because the trial court did not exercise its gatekeeping function with regard to the admission of expert testimony and failed to instruct the jury adequately as to how to assess such testimony, we reverse.[2]

The government charged that in 2009 and 2010, Sarkissian was the office manager for Sunset Clinic in Los Angeles, which billed Medicare more than $1.2 million for services in six months. According to the government, Medicare recipients were recruited to visit Sunset Clinic, where the doctor usually was not present and tests were billed to Medicare that were unnecessary or not performed.

---

[1]     This appeal was consolidated with the appeal in *U.S. v. Pogosian*, No. 16-50360. As the appeals raise different issues, and we earlier determined that the decisional process in *U.S. v. Pogosian* would not be significantly aided by oral argument, we issue separate decisions in each case.

[2]     Sarkissian requests [Doc. No. 19] that the Court take judicial notice of certain documents. First, Sarkissian attaches partial trial transcripts with testimony from Keith Kuntz from the cases of United *States v. Garrison*, No. 08-cr-1084 (C.D. Cal.) and *United States v. Iruke*, No. 09-cr-1008 (C.D. Cal.). Second, Sarkissian attaches an order from the case of United *States v. Anieze-Smith*, No. 13-cr-220 (C.D. Cal.), in which the court ruled in part that Jody Whitten was an expert witness. The government objects to the transcripts as constituting evidence not before the district court and moves to strike from the record any arguments based on the transcripts. The government does not oppose taking judicial notice of the court order. The motion for judicial notice is granted, and the motion to strike denied, as to the court order and to the partial transcript of the *Garrison* case, which was referenced at the trial in this case. As the *Iruke* case does not appear to be either briefed or part of the trial record, the motion for judicial notice is denied, and the motion to strike is granted, as to that transcript.

Sarkissian's defense was that, to his knowledge, Sunset Clinic provided legitimate medical services with decisions made by a medical professional that Sarkissian, as office manager, had no basis to question.

The alleged health-care fraud scheme operated in conjunction with a money-laundering scheme, in which the government charged that Sarkissian and managers at other clinics wrote checks to five sham corporations established by co-defendants. The checks sometimes included false notations that they were for professional or technical services, but instead were transfers of health-care fraud proceeds. The co-defendants wrote checks from the sham corporations to individuals, usually in amounts less than $10,000. These individuals then gave the cash to the co-defendants, who returned the cash to co-conspirators affiliated with the clinics, less a commission.

Before trial, the government provided potential expert witness notices under Federal Rule of Criminal Procedure 16 for six witnesses, including Keith Kuntz, a Special Agent with the United States Department of Health and Human Services, Office of Inspector General. Kuntz was designated as a "*modus operandi* expert witness," to testify as to how a fraudulent clinic operates to assist the jury in determining whether Sunset Clinic was a fraudulent clinic. The other witnesses, Jody Whitten, Lori Webber, Barbara Tallant, Dr. Andres Jimenez, and Dr. T. Alberto Om, were Medicare contractors, a legal-medical consultant, and two

treating physicians of patients who visited Sunset Clinic, respectively. The government did not consider these other witnesses to be experts under Rule 702, but instead lay witnesses testifying based on their personal knowledge under Federal Rule of Evidence 701. The government therefore described the Rule 16 notices as "protective."

Sarkissian filed a motion before trial to exclude the six witnesses, arguing that the Rule 16 notices were inadequate and that the proposed testimony was improper. The motion specifically argued that Kuntz's anticipated testimony failed to meet the expert opinion standards of Federal Rule of Evidence 702, and would be unduly prejudicial under Rule 403. Sarkissian further moved to exclude improper lay opinion testimony from the other identified witnesses, and specifically argued that their testimony was properly evaluated under Rule 702, not Rule 701. The trial court held a hearing, and denied the motion without explanation.

The day before trial, Sarkissian filed a motion to limit Kuntz's testimony, arguing that a recently-produced report showed that the government intended to add testimony regarding money laundering, as well as additional observations that had not been part of the Rule 16 disclosure. The trial court denied Sarkissian's motion on the record, stating that the Rule 16 notice had been "barely enough," but did not state whether Kuntz was qualified to testify as to money laundering.

All of the challenged witnesses testified at trial without limitation. No witness, including Kuntz, was qualified as an expert to testify at trial in the presence of the jury.

Kuntz testified that he was a special agent with 23 years of experience, and had taught about health-care fraud schemes. He testified that patients are often recruited and paid by marketers who transport them to corrupt clinics, which are barren and located in low economic areas. Instead of a physician, the patients are more likely to be seen by a physician's assistant ("PA"), who provides "cookie cutter" diagnoses with the same tests ordered for numerous patients, which are not tests that would ordinarily be ordered on a first visit. Kuntz further testified that office managers "typically orchestrate" the fraud and control the finances. Kuntz then testified to the nexus between the health-care fraud and the money laundering, which typically involved the use of corporations held by a straw man, moving the money to obscure the connection to the original fraud, as well as obtaining cash to pay kickbacks. Kuntz testified on cross-examination that he had no personal knowledge of the facts in the case and did not "hold [himself] out as an expert" in money laundering, but was speaking based on his own experience.

Whitten and Weber were employees of a company that had a contract to administer Medicare in Southern California, who testified as to whether Medicare would have paid the Sunset Clinic claims if additional information had been

disclosed. They explained the basic relevant features of the Medicare program, including the provider enrollment and claims submission processes, the general rules applicable to medical clinics and the prohibition on kickbacks for referrals, and introduced the relevant documents from Sunset Clinic. Tallant was a registered nurse who worked as a medical legal consultant and testified as to her findings from a review of 28 patient files from a clinic other than Sunset Clinic. Although the trial court instructed the jury not to consider evidence regarding other clinics against Sarkissian, Tallant also testified as to whether certain billings were proper and that it would be unusual for 30 patients to happen to have the same complaints and tests. Jimenez and Om were treating physicians to several Medicare beneficiaries who went to Sunset Clinic. They testified as to their personal knowledge of the patients' medical conditions, but also were asked their opinion of sending a first-time patient out for numerous tests and whether the ordered tests were medically appropriate or necessary.

At trial, the testimony of other witnesses also strayed into opinion evidence. For example, FBI Special Agent Nancy Kevany testified as to charts she prepared that included the distances patients traveled to visit Sunset Clinic, and noted that travelling 25-50 miles is outside the local community for medical care, and that multiple patients driving such a distance is therefore an indicator of fraud. FBI Special Agent Darrell Twedt was called to testify as to Sarkissian's dealings with a

6

confidential informant, but he also testified over objection that converting fraud proceeds into cash is done in health-care fraud schemes to pay for kickbacks or referrals. Veronica Gomez, a former Medicare fraud investigator, was called to testify about a medical clinic associated with Cahen, and therefore unrelated to Sarkissian. However, Gomez also identified red flags such as diagnostic tests on a single date of service without any additional date of follow-up service. Angelo Cruz, a Medicare fraud examiner, determined that parts of the claims were paid inappropriately, and that there was no valid delegation of service agreement at Sunset Clinic. Cruz also testified that services performed by the PA at Sunset Clinic should have been paid at a rate of 85%, not 100%, because the physician did not consult with the patients.

Other witnesses at trial testified solely based on their personal knowledge of the operation of Sunset Clinic. Maria del Carmen Lopez, a former employee of Sunset Clinic, testified that an individual named Arturo drove patients to and from the clinic, that Sarkissian paid Arturo, and that Sarkissian directed her not to talk with the clinic's physician, Louis Bascoy. She also testified as to the handling of patient files and testified that perhaps three allergy tests were conducted at the clinic each month.

Former employee Sylvia Perez testified that the inside of Sunset Clinic looked "normal," that it had rooms for seeing patients, for ultrasound, for testing,

7

and "for where they drew blood, did the EKG and the spirometry." Perez also testified that the PA saw patients, not the clinic doctor. The PA saw 10-15 patients each day, and spent about 15 minutes with each patient. The doctor, Bascoy, visited Sunset Clinic about once a week, checked charts, and signed them. Perez saw various tests done at the clinic, including some allergy tests. On cross-examination, Perez testified that she told agents in 2013 that Bascoy came to the clinic two or three times a week, would review patient charts, and was the final approval of whether her day off was approved.

Perez also testified as to the practices used to bring in patients: some patients walked in, but a driver, Arturo, worked there and brought patients to Sunset Clinic. According to Perez, Sarkissian described Arturo as a marketer and Arturo "would tell the patients that he would find on the street that they should go to the clinic because the clinic was okay and that they were going to treat them okay." Perez testified that some of the patients lived far away from Sunset Clinic, which seemed unusual.

Margarita Dosal, the office manager for Bascoy's primary clinic, testified that she, Bascoy, and Bascoy's attorney visited Sunset Clinic to obtain Bascoy's records. Dosal testified that Sunset Clinic lacked medical supplies and therefore looked more like a massage parlor than a clinic, that the records showed the patients travelled long distances, and that some of the documents purportedly

written or signed by Bascoy (who died in 2014 at age 86), were not in his handwriting. Another physician, Howard Pfupajena, testified about his observations that Sarkissian and the PA appeared to be jointly in charge at Sunset Clinic.

Several former patients also testified. Although these witnesses generally remembered few if any details about any visits to Sunset Clinic several years before trial, one witness testified that his sister-in-law told him that certain medical equipment was offered as an inducement to visit Sunset Clinic, and he received that equipment.

We review a district court's decision to admit expert testimony for abuse of discretion. *United States v. Reed*, 575 F.3d 900, 918 (9th Cir. 2009). "When the district court has erroneously admitted . . . prejudicial evidence, we remand for a new trial. We do so even if the district court errs by failing to answer a threshold question of admissibility. We have no precedent for treating the erroneous admission of expert testimony any differently." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 466 (9th Cir. 2014) (en banc) (citations omitted). Rule 702 allows the admission of "scientific, technical or other specialized knowledge" if it is both relevant and reliable. *Id.* The district court must "perform a gatekeeping function to ensure that the expert's proffered

testimony is both reliable and relevant." *United States v. Christian*, 749 F.3d 806, 810 (9th Cir. 2014) (internal quotation marks and citation omitted).

Rule 701 permits a lay witness to testify "in the form of an opinion" if it is "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. "[T]he line between lay and expert opinion depends on the basis of the opinion, not its subject matter." *United States v. Barragan*, 871 F.3d 689, 704 (9th Cir. 2017). The admissibility of such testimony is committed to the sound discretion of the trial court and its admission "will be overturned only if it constitutes a clear abuse of discretion." *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014) (internal quotation marks and citation omitted).

The district court made no relevance or reliability findings with regard to Kuntz's testimony; indeed the record contains no reasoning as to the basis for admitting Kuntz's testimony, in whole or in part, or whether Kuntz was qualified to offer testimony as to money laundering. Similarly, the record is silent as to whether the district court admitted the evidence of Whitten, Webber, Tallant, Jimenez, and Om pursuant to Rule 701 or Rule 702.[3] During trial, additional

---

[3] Other courts of appeal have held that it is error to allow a witness to testify as a fact witness as to his opinions on how Medicare functions and what Medicare would do in certain circumstances when his knowledge comes from

10

witnesses then gave opinion testimony, similarly without any determination as to its admissibility.

The trial court acknowledged during the charge conference that "there were unexpected expert opinions all over the place." However, the jury instructions failed to provide guidance to the jury in the assessment of this testimony. The trial court did instruct the jury that witnesses testified who because of education or experience were permitted to state opinions and the reasons therefore. This instruction, although it did not name the witnesses who so testified, correctly stated the law. However, the district court did not instruct the jury on how to evaluate witnesses who testified as to both facts and opinions. This failure, which apparently was not raised at trial, constituted plain error. *United States v. Torralba-Mendia*, 784 F.3d 652, 658 (9th Cir. 2015).

Although there were errors at trial, Sarkissian is not entitled to relief unless he was prejudiced. *Id.* "The erroneous admission of expert testimony is subject to

---

working as a Medicare fraud investigation educator. *United States v. Willner*, 795 F.3d 1297, 1316 (11th Cir. 2015). *See also United States v. Vega*, 813 F.3d 386, 395 (1st Cir. 2016) (holding that testimony fell "outside the boundaries of lay expertise" where the witnesses could "form their opinions only by understanding technical Medicare laws and regulations;" acquiring such knowledge through their occupations "does not make it 'personal knowledge' qualifying as lay expertise under Rule 701"); *United States v. White*, 492 F.3d 380,403-04 (6th Cir. 2007) (testimony was expert, not lay, where witnesses relied "to a significant degree on specialized knowledge acquired over years of experience as Medicare auditors").

11

harmless error review, just like all other evidentiary errors." *United States v. Wells*, 879 F.3d 900, 923 (9th Cir. 2018) (citations omitted). Where expert testimony has been erroneously admitted, "[w]e begin with a presumption of prejudice." *Id.* (citation omitted). The government must show that it is more probable than not that the jury would have reached the same verdict if the evidence had not been admitted. *Id.* at 924. "[A] new trial is warranted when evidence admitted through an erroneous analysis prejudices the opposing party but the record is too sparse to conduct a proper admissibility analysis and decide whether the admission itself was erroneous." *Christian*, 749 F.3d at 813.

The record here is too sparse. We cannot determine whether certain testimony was admitted pursuant to Rule 701 or Rule 702, or whether the witnesses were qualified. For example, Kuntz himself acknowledged that money laundering by fraudulent clinics was not his area of expertise, but he gave such testimony before the jury without limitation. Although the admission of any single witness's testimony likely was harmless, numerous witnesses offered opinion testimony, particularly with regard to the signs of a fraudulent clinic that provided important context for the jury to evaluate the evidence of the percipient witnesses as to how Sunset Clinic operated. Because the opinion testimony was not vetted, and the jury was not instructed as to how it should assess the testimony, there is a real possibility of jury confusion. *United States v. Freeman*, 498 F.3d 893, 903–04

12

(9th Cir. 2007). The jury had no basis on which it could determine whether a witness "relied upon or conveyed hearsay evidence when testifying as a lay witness or . . . based [his or her] lay testimony on matters not within his personal knowledge." *Id.* at 904. When the cumulative effect of the testimony and its importance to the government's case are considered, "[o]ur review of the record leaves us without a fair assurance that the jury was not substantially swayed by the error[s]" in convicting Sarkissian. *United States v. Lloyd*, 807 F.3d 1128, 1168 (9th Cir. 2015) (internal quotation marks and citation omitted).

Because we reverse and remand for a new trial, we do not reach the arguments regarding improper rebuttal argument or error at sentencing.

**REVERSED**.

*United States v. Sarkissian*, No. 16-50347

CHRISTEN, Circuit Judge, dissenting.

Assuming that some of the government's witnesses offered improper opinion testimony at trial, my view is that the government's other evidence easily overcame the resulting presumption of prejudice. Accordingly, I respectfully dissent from the court's decision.

The majority is likely correct that at least some of the six witnesses Sarkissian moved to exclude *in limine* wound up giving improper opinion testimony,[1] and the record makes it difficult to discern the district court's rationale for admitting their opinions. I agree that we begin with a presumption of prejudice when expert witness testimony is improperly admitted, but that presumption is rebuttable. Our case law is clear that it can be overcome "'by a showing that it is

---

[1] Sarkissian also contends that the district court erred by failing to provide a so-called "dual role" instruction to explain to the jury how it should examine the testimony of witnesses who testified as fact witnesses and as experts. Sarkissian rightly concedes that we review this challenge for plain error, but he fails to meet that demanding standard because nothing in the record reveals that the alleged error undermined his substantial rights. First, the district court did explain the difference between the two types of testimony. Second, many of the witnesses he claims provided mixed testimony had no basis to testify as fact witnesses and could not have testified in dual roles. Finally, to the extent some witnesses did testify in dual roles, Sarkissian does not explain how their mixed testimony affected the verdict. *See United States v. Torralba-Mendia*, 784 F.3d 652, 661 (9th Cir. 2015) ("We remedy a district court's plain error only when the defendant shows that the error affected his substantial rights.").

more probable than not that the jury would have reached the same verdict even if the evidence had not been admitted.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 465 (9th Cir. 2014) (quoting *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1159 (9th Cir. 2010)). The government's evidence easily cleared this hurdle.

Sarkissian claims that Tallant improperly offered her opinion as to the propriety of certain bills; that doctors Jiminez and Om improperly opined on the legitimacy of Sunset Clinic; and that Whitten and Webber gave improper opinions regarding the framework of Medicare regulations and "red flags" that are generally indicative of fraud. With respect to Department of Health and Human Services Special Agent Keith Kuntz, Sarkissian contends that the district court failed to properly vet his opinions for reliability and relevance, and that the government used Kuntz's testimony to establish "the benchmark for inferring fraud" based on indicators that Sunset Clinic had in common with many similar clinics. From there, Kuntz explained that office managers like Sarkissian are typically at the center of fraudulent schemes at this type of clinic. Finally, Sarkissian argues that Kuntz improperly testified that fraudulent clinics typically launder illicit profits to avoid detection, only to later admit that he was not an expert in money laundering.

If Sarkissian had demonstrated that these experts were unqualified to render

2

all of these opinions—and I am not convinced that he did—the government still presented sufficient evidence to overcome any resulting prejudice. Percipient fact witnesses told the jury that: (1) Sunset Clinic employed a single elderly doctor who saw no patients and served in name only for the purpose of billing Medicare; (2) the clinic was staffed by a single physician's assistant and had only a single room for patient exams, but claimed to see up to sixty or more patients per day; (3) a majority of patients lived more than twenty-five miles from the clinic; and (4) the lone physician's assistant repeatedly ordered the very same battery of tests for the clinic's patients, even though its patient population was widely diverse. Finally, the jury heard one witness testify that Sarkissian needed cash to pay patients to come to Sunset Clinic. This evidence was highly probative of an ongoing fraudulent operation, it amply supported the jury's verdict, and it is difficult for me to imagine that the jury could have reached any other result after hearing the government's case against Sarkissian, who acted as the clinic manager.

With regard to the money laundering allegations, the government introduced a recorded conversation between Sarkissian and a confidential informant in which Sarkissian offered to convert checks from a healthcare company into cash. Moreover, the jury heard Special Agent Kuntz expressly disavow any expertise in money laundering and his statements on that score were, at most, cumulative of the

3

government's other trial evidence.  It did not rise to the level of prejudice necessary to reverse Sarkissian's conviction.  *See United States v. Jennell*, 749 F.2d 1302, 1308 (9th Cir. 1984) (observing that "cumulative nature" of "improperly admitted documents" "rendered their admission harmless").

Because I conclude that the government introduced more than sufficient evidence of Sarkissian's guilt to overcome any prejudice caused by improperly admitted evidence, I respectfully dissent.